## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MELISSA GORDON, | : | |
|   Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 3:14-cv-01348 (VLB) |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF SOCIAL | : | March 2, 2017 |
| SECURITY, | : | |
|   Defendant. | : | |

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the Plaintiff, Melissa Haman's, application for disability insurance benefits ("DIB").[1]  It is brought pursuant to 42 U.S.C. §§ 405(g).  Melissa Haman[2] ("Plaintiff" or "Haman") has moved for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"), or remanding the case for rehearing. [Dkt. No. 17.]  The Commissioner, in turn, has moved for an order affirming the

---

[1]  Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]."  42 U.S.C. § 405(b)(1).  The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs").  C.F.R. §§ 404.929 *et seq.*  Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council.  20 C.F.R. §§ 404.967 *et seq.*  If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

[2] The Complaint and the captions of all briefing in this action refer to Plaintiff as Melissa Gordon.  However, claimant introduced herself at the disability hearing as Melissa Haman [Dkt. No. 11-3 at 31], all briefing (aside from case captions) references her as Ms. Haman, and the Administrative Law Judge's decision references her as Ms. Haman.  *Id.* at 12.  The Court accordingly refers to the claimant as Melissa Haman throughout this decision.

decision.  [Dkt. No. 24.]  On April 8, 2016 the case was fully briefed.  For the following reasons, Messina's Motion for an Order Reversing or Remanding the Commissioner's Decision [Dkt. No. 17] is DENIED, and the Commissioner's Motion to Affirm that Decision [Dkt. No. 24] is GRANTED.

I.    **Factual Background**

The following facts are taken from the parties' Joint Stipulation of Facts ("Joint Stipulation") [Dkt. No. 37] unless otherwise indicated.

a.   <u>Plaintiff's Background</u>

Haman was born in 1970.  [Dkt. No. 11-3 at 33.]  She graduated from high school and has no further education.  *Id.* at 33, 36.  She worked as a receptionist and show room salesperson at Southington Glass Company for eight and a half years and stopped when she broke her ankle on April 6, 2010.  [*Id.* at 36-38.]  She was last insured on December 31, 2015.[3]  [Dkt. No. 11-3 at 12.]  On August 9, 2011, Haman applied for a Period of Disability and Disability Insurance Benefits.  [Dkt. No. 11-6 at 189.]  On October 19, 2011, a disability adjudicator in the Social Security Administration denied her initial request for disability benefits and thereafter denied her request for reconsideration.  [Dkt. No. 11-4 at 71, 85.]

On January 22, 2013, Haman appeared (with counsel) for a hearing before an Administrative Law Judge ("ALJ").  [Dkt. No. 11-3 at 29.]  On February 19, 2013, the ALJ issued a decision denying benefits.  *Id.* at 12.  On July 12, 2014, the

---

[3]  **In order to be entitled to disability benefits, a plaintiff must "have enough social security earnings to be insured for disability, as described in § 404.130." 20 C.F.R. § 404.315(a)(1); *see also Brockway v. Barnhart*, 94 F. App'x 25, 27 (2d Cir. 2004) (noting a claimant's eligibility for Social Security disability insurance benefits terminates on the claimant's date last insured).**

appeals council denied Messina's request for review of that decision thereby making the ALJ's decision the final decision of the Commissioner. *Id.* at 1. This appeal followed.

b. Plaintiff's Medical History

On February 11, 2010, Haman visited Dr. Phil Watsky, her primary care physician, complaining of anxiety and fibromyalgia. [Dkt. No. 11-8 at 316.] Dr. Watsky noted Haman experienced leg aches, exhaustion, and dizziness, and indicated an impression that she suffered from fibromyalgia. [Dkt. No. 11-8 at 316.]

On March 5, 2010, Haman visited Ellen Babcock, a therapist with the Bristol Hospital Counseling Center. *Id.* at 324. Ms. Babcock recommended Haman practice coping skills to manage her anxiety and depression. *Id.* On March 10, 2010, Ms. Babcock conducted an individual therapy session to discuss Haman's feelings of depression, frustration, and anger. *Id.* at 322.

On April 5, 2010, Haman fell and fractured her right ankle. [Dkt. No. 11-8 at 273.] That day, Dr. Frank Gerratana surgically added stabilizing hardware to her ankle to address the fracture. *Id.* at 286, 310. On May 2, 2010, Haman tripped again, causing "a snapping sensation in her ankle" and "increased pain." *Id.* at 310. Dr. Gerratana examined her the following day and noted some swelling, moderately restricted motion, and some diffuse tenderness of the ankle, but x-rays indicated the stabilizing hardware was still in place. *Id.* at 310. Dr. Gerratana instructed Haman to continue using a CAM walker (a medical walking boot) and report back for reassessment in one month. *Id.* at 310. At her follow-up

appointment on June 3, 2010, Dr. Gerratana noted continued ankle discomfort and stiffness, but x-rays indicated further healing. *Id.* at 309. Dr. Gerratana instructed her to continue using her CAM walker as well as an ankle brace. *Id.* On month later, on July 15, 2010, Dr. Gerratana noted Haman limped, had some right ankle weakness, and still took Tylenol and ibuprofen for pain. *Id.* at 308. X-rays revealed the right ankle fracture had healed and showed her right knee was normal. *Id.* Dr. Gerratana instructed Haman to begin physical therapy. *Id.* On August 19, 2010, Dr. Gerratana noted physical therapy had "improved motion and strength of her ankle," but had not completely restored its range of motion. *Id.* at 307. He ordered Haman to continue the exercise program. *Id.*

On September 1, 2010, Haman returned to Ms. Babcock for the first time since her ankle surgery, and reported continued anxiety and depressed mood. *Id.* at 323. Ms. Babcock rated Haman's Global Assessment of Functioning ("GAF") score as 52 out of 100 and recommended continued psychiatric treatment to stabilize her mentally and help her gain the skills needed to maximize her functional level. *Id.*

On December 2, 2010, Dr. Gerratana noted increased range of motion in Haman's right ankle, determined she would "be allowed increased activities," and "expected that she will continue to improve with time." *Id.* at 305.

On December 3, 2010, Haman ceased psychiatric treatment at Bristol Hospital Counseling Center. *Id.* at 321. Haman reported she would no longer attend treatment because she lost her job after she fractured her ankle and had no source of transportation to counseling appointments. *Id.* at 321. Discharge

4

notes indicate Haman's symptoms of anxiety and depression "waxed and waned" throughout her treatment. *Id.* Ms. Babcock included in Haman's final diagnosis that she experienced post-traumatic stress disorder[4] and mood disorder in addition to anxiety and depression. *Id.* She rated Haman's treatment goals as "generally met to not met" and characterized her treatment as "successful or partially successful." *Id.*

On March 4, 2011, Haman reported residual right ankle discomfort as well as knee discomfort which worsened with activity or changes in the weather. *Id.* at 304. Dr. Gerratana noted she walked with a limp and had some diffuse tenderness in her knees; x-rays revealed some right knee diffuse osteoporosis. *Id.* Three months later, on June 13, 2011, Dr. Gerratana noted Haman continued to walk with a limp, had mild right ankle swelling and some tenderness, and had slightly decreased range of motion in her ankle. *Id.* at 303. X-rays showed the right ankle was "solidly united." *Id.* Dr. Gerratana also noted mildly restricted motion and some tenderness in Haman's knees, gave her heel lifts, and instructed her to continue taking Tylenol and Motrin. *Id.*

On August 12, 2011, Dr. Watsky examined Haman and found her legs were puffy and she had multiple tender points.[5] *Id.* He prescribed Cymbalta for her fibromyalgia. *Id.*

---

[4] Medical records attribute Haman's post-traumatic stress disorder to a motor vehicle accident in 1996 in which Haman injured her back and her boyfriend was paralyzed.  [Dkt. No. 11-3 at 342.]
[5] A tender point exam may be used to diagnose fibromyalgia, and consists of the physician checking 18 specific points on a person's body and determining how many are painful when pressed firmly. *Fibromyalgia: Tests and Diagnosis*, MAYO

On September 21, 2011, Dr. Sabeen Anwar, a rheumatologist, examined Haman on referral from Dr. Gerratana. *Id.* at 325. She reviewed Haman's medical history including her ankle fracture and residual pain, fibromyalgia diagnosis in 1993, and related musculoskeletal pain and stiffness in her fingers, knees, ankles, hips, and upper back. *Id.* Dr. Anwar found no evidence of synovitis,[6] restricted range of motion only in her right ankle, tenderness in her hands, and several tender points. *Id.* at 325-26. Dr. Anwar assessed Haman has "5/5 upper and lower extremity strength with the exception of the right quadricepts which is limited slightly due to pain." *Id.* at 326. X-rays revealed diffuse osteoarthritis of the right knee. *Id.* Dr. Anwar recommended a gradual exercise regimen, yoga, and tai chi. *Id.*

On March 12, 2012, Haman visited the Grove Hill Medical Center Orthopedic Surgery and Sports Medicine Center (Dr. Anwar's place of work) regarding her continued ankle discomfort and fibromyalgia pain. *Id.* at 345. The examiner[7] found Haman continued to experience decreased range of motion in her ankle which caused her to limp. *Id.* Haman also reported she was not

---

CLINIC, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/tests-diagnosis/con-20019243 (last visited February 10, 2017).
[6] Synovitis is inflammation of connective tissue lining synovial joints. *See* Synovitis Definition, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/synovitis (last visited Feb. 6, 2017). Synovial joints allow for movement, for example, the shoulder or knee. *See Diarthrosis Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/diarthrosis#medicalDictionary (last visited Feb. 6, 2017).
[7] Notes from the March 12 visit are titled "Medical Assistant Notes" but do not identify the examining personnel.

satisfied with Dr. Anwar's treatment[8] and would be seeking a different rheumatologist. *Id.*

On March 22, 2012, Dr. Nicholas Formica, a rheumatologist, examined Haman and found she had a "slight antalgic[9] gait, although [she] walked without the use of a cane," and had "slight soft tissue swelling about the right ankle region." *Id.* at 349. Dr. Formica found Haman had "18/18 tender points . . . which were quite significant," as well as "diffuse mild to moderate muscle tenderness" and decreased range of motion of the right ankle. *Id.* at 350. Dr. Formica found no obvious hand swelling but some mild tenderness. *Id.* Haman's motor strength was intact. *Id.* Dr. Formica reviewed results of lab tests Dr. Anwar had conducted and found no inflammation, further confirming his fibromyalgia diagnosis. *Id.* He also noted that Haman had difficulty sleeping. *Id.* Dr. Formica recommended an alternative non-steroidal agent to manage Haman's symptoms and an alternative medication to aid her sleep if medicine prescribed by Dr. Gerratana proved ineffective. *Id.*

On May 31, 2012, Dr. Formica examined Haman again and confirmed she still had "18 out of 18 tender points [and] diffuse muscle tenderness . . . in all extremities." *Id.* at 360. Dr. Formica prescribed pain medication to manage her fibromyalgia. *Id.* at 361. However, that medication caused Haman's legs to swell, and Dr. Formica instructed her to stop taking it on June 8, 2012. *Id.* at 356.

---

[8] Haman testified at the disability hearing that she left Dr. Anwar's care because personnel at that doctor's office were rude to her. [Dkt. No. 11-3 at 15.]
[9] An antalgic gait is "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)." *Antalgic Definition*, Merriam-Webster Dictionary, https://www.merriam-webster.com/medical/antalgic (last visited February 8, 2017).

On June 25, 2012, Dr. Gerratana found Haman's right ankle had become symptomatic of posttraumatic arthritis, with mildly restricted range of motion and some diffuse tenderness.  *Id.* at 379.

On September 6, 2012, Dr. Formica noted Haman had "normal strength, normal gait, . . . [and] no significant joint swelling."  *Id.* at 375.  He instructed Haman to take ibuprofen and Tylenol together to manage her fibromyalgia since she could not afford the cost of Lyrica.  *Id.*

On September 24, 2012, Dr. Gerratana noted Haman's continued limp, moderately restricted range of motion and diffuse tenderness in her right ankle and knees.  *Id.* at 378.  Otherwise, Haman had "good motion, strength, and stability" in her left ankle and knees, good hip motion, and "appropriate mood, affect, orientation, and coordination."  *Id.*  Dr. Gerratana supplied Haman with heel lifts and instructed her to continue her current medications.  *Id.*

On October 12, 2012, Dr. Formica noted Haman continued to have 18 out of 18 tender points and diffuse muscle tenderness in all extremities to a moderate degree.  *Id.* at 371.  Dr. Formica prescribed Flexeril for her fibromyalgia pain.  *Id.*

On December 6, 2012, Dr. Formica noted that Haman's "overall condition ha[d] improved slightly since she is using the Flexeril" and her sleep pattern had improved.  *Id.* at 367.  However, Haman's overall pain registered as ten out of ten, she had 18 out of 18 tender points, and she continued to experience diffuse muscle tenderness in all extremities.  *Id.* at 367-68.  Dr. Formica also noted Haman was "quite anxious about her upcoming hearing" regarding disability

eligibility.  *Id.* at 369.  He instructed Haman to continue her current therapy.  *Id.* at 368.

### c.  Medical Examinations and Opinions

The Plaintiff underwent several independent medical examinations by non-treating medical experts.  Those experts, as well as Haman's treating physicians, rendered opinions which follow.

Hamon was referred by Disability Determination Services for a mental status examination by consulting psychologist Dr. Diana Badillo Martinez, Ph.D who reviewed Haman's medical and psychiatric history, conducted a psychiatric examination and rendered an opinion.  [Dkt. No. 11-8 at 342.]  Dr. Badillo Martinez assessed that Haman is "polite, cooperative, and engages easily," has a normal affect, clear but slow speech, and average attention span.  *Id.* at 342-43.  However, Dr. Badillo Martinez also found Haman had difficulty sleeping, below average thought processes, weak reasoning ability, and feelings of inadequacy, with overall intellectual abilities within the low to average range.  *Id.* at 343.  Dr. Badillo Martinez noted Haman's low intellectual ability "does not facilitate recovery" from her physical problems.  *Id.*  She diagnosed Haman with pain disorder associated with psychological medical factors, panic disorder, and personality disorder not otherwise specified ("NOS").  *Id.* at 344.  Dr. Badillo Martinez recommended individual psychotherapy to gain awareness of the relationship between her emotions and physical distress, improve her coping skills, and help her to overcome her feelings of incapacity.  *Id.*  Dr. Badillo Martinez opined that Haman could engage in sedentary work on a part-time basis given her condition.  *Id.*

On October 12, 2012, Dr. Formica, who had been treating Haman since March 22, 2012, rendered an opinion on Haman's physical limitations.  [Dkt. No. 11-8 at 365.]  He explained that fibromyalgia patients experience severe fatigue, poor concentration, anxiety, poor sleep, and difficulty coping with normal activities of daily life, as well as muscular pain and tenderness.  *Id*.  He found Haman's daily limitations and chronic pain could be exacerbated unpredictably and a flare up of her symptoms could last seven to ten days.  *Id*.  Dr. Formica also stated Haman has a permanent limp, a seven percent disability of her left knee due to a fall in 2001, and pain in her right ankle.  *Id*.  As a result, Dr. Formica concluded Haman is not a candidate for employment of any kind.  *Id*.

State agency consultant Dr. Khurshid Khan reviewed the Plaintiff's medical record and determined Haman had multiple medically determinable impairments including fractures of a lower limb, fibromyalgia, osteoporosis, anxiety, personality disorder, and somatoform disorder.[10]  [Dkt. No. 11-4 at 76.]  He found Haman retained the Residual Functional Capacity ("RFC) to occasionally lift 20 pounds, frequently lift 10 pounds, stand, walk, or sit for six hours in an eight-hour workday, and push or pull an unlimited amount.  *Id*. at 77.  He opined that Haman could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, could frequently balance, stoop, or kneel, and could occasionally crouch or crawl.  *Id*. at

---

[10] A somatoform disorder is "any of a group of psychological disorders . . . marked by physical complaints for which no organic or physiological explanation is found and for which there is a strong likelihood that psychological factors are involved.  *Somatoform Disorder Definition*, Merriam-Webster Dictionary, https://www.merriam-webster.com/medical/somatoform%20disorder (last viewed February 12, 2017).

78-79.  Limitations were attributed to Haman's fibromyalgia and fractured right ankle.  *Id.* at 78.

Dr. Pamela Fadakar, PsyD, examined Haman's mental health records in supplementation of Dr. Khan's review to determine whether Haman had any qualifying mental health conditions and their impact on her residual functional capacity. In her opinion, Id. at 76-77.  none of Haman's mental impairments met or equaled the requirements of a listed impairment, as Haman was only mildly restricted in activities of daily living and social functioning and had no recorded episodes of decompensation.  *Id.* Dr. Fadakar opined that Haman's mental limitations render her moderately limited in ability to follow detailed instructions, maintain attention or concentration for extended periods, perform at a consistent pace without an unreasonable number of rest periods, or complete a normal workday without interruptions from psychologically-based symptoms.  *Id.* at 80.  She opined that Haman could "perform simple/routine tasks for 2 [hour] periods during a [normal] work day/ [week] in a setting [without] strict time or production requirements" and could "adhere to a set schedule up to her physical limits and work around others," but would "have difficulty performing more complex tasks in a timely manner."  *Id.* at 80.  Dr. Fadakar also opined that Haman is "better suited for non-public work" but can "relate adequately w[ith] supervisors and coworkers on a superficial basis and request help when needed."  *Id.* at 80.

Dr. Carol Honeychurch, a State agency consultant, reviewed the medical record, found Haman has three medically determinable impairments and assessed her Residual Functional Capacity ("RFC").  Based on her findings that

Haman had a fracture of a lower limb, fibromyalgia, anxiety, and personality disorders, all of which were medically determinable impairments, Dr. Honeychurch opined that Haman retains the RFC to occasionally lift 20 pounds, frequently lift 10 pounds, stand, walk, or sit for six hours in an eight-hour workday, and is unlimited in ability to push or pull.  *Id.* at 91-92.  She opined that Haman could occasionally climb ramps or stairs, could never climb ladders, ropes, or scaffolds, and could occasionally balance, stoop, kneel, crouch or crawl.  *Id.* at 92-93.  Limitations were identified as arising from Haman's fibromyalgia and fractured right ankle.  *Id.* at 93.

Dr. Warren Leib provided a mental health analysis to supplement Dr. Honeychurch's analysis.  He found Haman's anxiety and personality disorders do not qualify as listed impairments, and found her impairments render her moderately limited in ability to follow detailed instructions, maintain attention or concentration for extended periods, perform at a consistent pace without an unreasonable number of rest periods, or complete a normal workday without interruptions from psychologically-based symptoms.  *Id.* at 94-95.  He explained that Haman could perform simple or routine tasks for two hours at a time during a normal workday in a setting without strict time or production requirements, and could adhere to a set schedule up to her physical limits and work around others, but would have difficulty performing more complex tasks in a timely manner.  *Id.* at 95.  In addition, Dr. Leib noted Haman's moderately limited ability to interact with the general public appropriately made her better suited for work in a non-public setting, although she could relate adequately with supervisors and

coworkers on a superficial basis.  *Id.* at 95.  Dr. Leib also noted Haman is

moderately limited in her ability to respond appropriately to changes in the work

setting, but could adapt to minor or routine work adjustments, travel, avoid safety

hazards, and set simple work goals.  *Id.* at 95.

> d.  <u>The Hearing Before the ALJ</u>

On January 22, 2012, ALJ James E. Thomas ("ALJ Thomas") held a hearing

to consider Haman's disability claim.  [Dkt. No. 11-3 at 31.]  Haman was

represented by counsel.  *Id.* at 34.  Haman testified she last worked on April 6,

2010, as a receptionist and show room salesperson at Southington Glass

Company.  *Id.* at 36-37.  She worked at Southington Glass for eight and a half

years answering phones, scheduling appointments, and handling sales.  *Id.* at 37-

38.  She sometimes lifted and carried glass, but asked for assistance lifting items

weighing over eight to ten pounds due to her fibromyalgia.  *Id.* at 43-44.  She

stopped working in April 2010 when she tripped and fractured her ankle.  *Id.* at 38.

Haman explained she completed five months of physical therapy after her ankle

surgery and continued to practice at-home physical therapy as of the hearing

date.  *Id.* at 39.  She still had residual pain in her ankle, as well as fibromyalgia

pain "throughout [her] whole body every minute of every day."  *Id.* at 39-40.  Her

fibromyalgia pain worsened after her 2010 accident.  *Id.* at 44.

Haman also described her daily living conditions.  She walks with a cane

when she needs to leave her house and the weather is inclement or her legs are

swollen.  *Id.* at 40-41.  She explained she walks with a limp and walking is more

difficult when her legs swell.  *Id.*  With a cane, she can walk "maybe a quarter

mile" at a time. *Id*. at 51.  Haman also noted her left knee is arthritic and prevents her from kneeling, squatting, bending, or running. *Id*. at 41-42.

Haman added that she gets "really, really bad headaches to the point that [she] can't think straight." *Id*. at 47.  She also testified she is more forgetful than she used to be, and has to write things down to remember them. *Id*.  Her headaches last three to four days at a time and occur four to five times per month. *Id*. at 47-48.  She takes ibuprofen or Tylenol to manage her headaches but is allergic to migraine medication. *Id*. at 48.

Haman's average daily pain level is a six or seven out of ten, but on "really bad days" her pain level rises to nine. *Id*. at 49.  Weather affects her pain level; in the winter, Haman has a "really bad" day about eighteen to twenty out of every thirty days. *Id*.  Her fibromyalgia pain, combined with anxiety, "keeps [her] from doing daily life" and has led her not to leave her house alone anymore. *Id*. at 48-49.  When her fibromyalgia pain is particularly bad, Haman lays down for twenty to thirty minutes to "try to calm down." *Id*. at 53.  She stated she lays down due to fibromyalgia pain one to four times per day. *Id*.

Haman also testified she has arthritis in her hands[11] and her fingers swell roughly twice a week, which makes it difficult for her to pick things up, hold onto things, or wash her hair. *Id* at 56, 63.  When her fingers are swollen, Haman can use a computer for half an hour at a time. *Id*. at 57.

---

[11] **ALJ Thomas asked Haman to clarify who told her she had arthritis in her hands, noting Dr. Anwar evaluated an x-ray of Haman's hands and found "no significant arthritis."** *Id*. at 62.  **Haman responded that Dr. Gerratana "verified the arthritis in the knees and the ankle and I showed him my hands and he says basically the same thing."** *Id*.  **Haman added that arthritis runs in her family.** *Id*.

Haman testified she has had anxiety since she was fifteen years old but stopped seeing a therapist after her fall in April 2010.  *Id.* at 53-54.  Haman stopped attending therapy because she was using crutches which made it "hard to get around" and could not drive.  *Id.*  Once she was sufficiently healed to go to therapy again it had been over a year since her last appointment.  *Id.* at 54.  Because of the delay, she would have had to pay for a renewed intake meeting, which she could not afford.  *Id.*  at 54.  As a result, Haman stopped participating in therapy.  *Id.*  However, her primary care physician, Dr. Watsky, prescribes her anxiety medication.  *Id.*

Haman stated her anxiety caused her to get "very nervous" and "hyperventilate" when she worked at Southington Glass Company.  *Id.* at 54-54.  Her anxiety attacks occur "for no major reason," and continue to occur three to four times each week, lasting up to two and a half hours each.  *Id.* at 55.

Haman lives with her boyfriend in a one-level home.  *Id.* at 35-36.  On a typical morning, she wakes up and stretches to relieve her stiffness, takes medication, and eats breakfast.  *Id.* at 58.  Depending on her pain level, she spends time during the day on the computer or watching television.  *Id.* at 58-59.  She does "light and simple" cooking, washes and dries her dishes.  *Id.* at 59.  She can comfortably lift two to three pounds at a time.  *Id.* at 51.  Haman's boyfriend does the laundry because Haman is afraid she might fall walking down the stairs to the laundry machines in the basement, but Haman folds the laundry when he brings it back upstairs.  *Id.* at 59. Haman does go to the basement if her

boyfriend is not home and she needs to get something, but she avoids doing so if possible. *Id*. at 59-60.

It is painful for Haman to raise her arms above her head, for example to shower or to put away dishes in high cabinets. *Id*. at 52. She keeps dishes in low cabinets so she can put them away after washing with minimal pain. *Id*. Haman also has difficulty bending down because her medications make her dizzy. *Id*. Haman goes to the grocery store with her father every week, pushes the cart, and lifts some lightweight items off of shelves. *Id*. at 51-52, 60. Her father lifts heavier items and helps her put groceries away at home. *Id*. at 60.

During the hearing, Haman asked to stand because she was "really sore." *Id*. at 50. Haman explained she is generally able to sit between five and twenty minutes at a time, depending on the day. *Id*. at 51.

In addition, the Commissioner called a Vocational Expert, Renee Jubrey, who testified at the hearing. *Id*. at 64. Ms. Jubrey also characterized Haman's past work as a composite of sedentary, semi-skilled work as a receptionist and light, low-level semi-skilled work as a salesperson. *Id*. at 64-65. Given Haman's age, vocational background, educational level, and limitations, Ms. Jubrey opined that she could not perform her past work. *Id*. at 65. However, Ms. Jubrey stated a person with Haman's background and limitations could work as a marker (one who works in the back room of a retail establishment pricing and hanging up items), routing clerk (one who places packages into bins based on zip code at a shipping store), or mail clerk. *Id*. at 66-67. All three jobs are light, unskilled work that exist in significant numbers in the national and local economy. *Id*. at 66.

Ms. Jubrey testified that, were Haman to require an option to sit or stand at will, avoid interactions with the public, and avoid production requirements, she could only work as a mail clerk. *Id.* at 66-67. In addition, she opined that no jobs would be available if, instead of an option to sit or stand at will, Haman required the ability to sit for six hours and stand for two hours every workday, as well as the ability to avoid interactions with the public. *Id.* at 68. Finally, Ms. Jubrey stated no jobs would be available for a candidate with Haman's background and limitations that would allow the candidate to be off-task for impairment-related reasons for fifteen percent of each workday. *Id.*

e. The ALJ's Decision

On February 19, 2013, ALJ Thomas issued a decision finding Haman was not disabled within the meaning of the Social Security Act from April 6, 2010, the alleged date of onset of disability, through the date of the decision. [Dkt. No. 11-3 at 12.]

ALJ Thomas found Haman had severe impairments including fibromyalgia, residual effects of fracture of the lower extremity, osteoarthritis, affective disorder, anxiety disorder, and personality disorder. *Id.* at 14. He found Haman's impairments did not meet or medically equal the severity of a listed impairment under 20 C.F.R. 404, Subpart P, Appendix 1, nor did any combination of Haman's impairments medically equal a listed impairment. *Id.* at 15. ALJ Thomas especially considered whether the combination of fibromyalgia and residual effects of Haman's right ankle fracture met or equalled the requirements of listing 1.02, concerning major dysfunction of a joint. *Id.* However, listing 1.02 requires

impairment of one major peripheral weight bearing joint resulting in the inability to ambulate effectively, or involving one major peripheral joint in each upper extremity causing inability to perform fine and gross movements effectively. *Id.* ALJ Thomas determined Haman can ambulate without an assistive device and there is "no evidence of arthritic changes in her upper extremities and she has full upper extremity strength." *Id.* Accordingly, ALJ Thomas found Haman did not meet the requirements of listing 1.02.

ALJ Thomas also considered whether Haman's mental impairments met or equalled the requirements of listings 12.04, 12.06, or 12.08. *Id.* For a mental impairment to qualify as a listed impairment, it must cause marked difficulties in at least two of the following: daily living, social functioning, maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration. *Id.* Marked difficulties are "more than moderate but less than extreme." *Id.*

ALJ Thomas considered an Activities of Daily Living Report Haman completed on August 16, 2011, stating she could go to the bathroom, brush her teeth and hair, get dressed, stretch, have breakfast, check her email, look for jobs, watch television, water flowers, do laundry and housework, make dinner, shower, read, and take medication without assistance. *Id.* at 15-16. Accordingly, the ALJ found she has no more than mild restriction of daily activities. *Id.*

ALJ Thomas found Haman has no more than moderate difficulties with social functioning. *Id.* at 16. He reasoned Haman's hearing testimony that she has anxiety attacks three to four times per week was counterbalanced by Dr.

Badillo Martinez's opinion that Haman was polite, cooperative, easily engaged, and had normal affect.  *Id.*

The ALJ also found Haman has moderate difficulties with concentration, persistence, or pace based on Haman's hearing testimony that she is forgetful and Dr. Badillo Martinez's opinion that Haman has below-average thought processes, weak reasoning, low-to-average intellect, and an average attention span.  *Id.* at 16.

Finally, ALJ Alger noted no instances of decompensation in the medical record and no episodes requiring a significant alteration of psychiatric medication or a more structured psychological support system, such as hospitalization for a prolonged period.  *Id.*

Because Haman did not experience marked limitation in at least two of the four categories of mental impairment, Haman did not meet the qualifications of the listed psychiatric impairments.[12]  *Id.*

Having found no listed impairment, ALJ Thomas next considered Haman's RFC.  ALJ Thomas considered Haman's hearing testimony regarding her limitations, including her testimony that she can only walk one quarter of a mile with a cane.  *Id.* at 18.  However, he found Haman's testimony inconsistent with

---

[12] **ALJ Thomas further noted that even if Haman showed marked impairment in two of the mental health limitation categories, the listed psychiatric impairments also require repeated episodes of decompensation or one or more years' inability to function outside of a highly supportive living environment.  *Id.* at 16-17.  ALJ Thomas found Haman did not require a highly supportive living environment, as she testified she can do light cooking and housework, use a computer, and leave her home to go to medical appointments or to go grocery shopping.  *Id.*  As discussed above, Haman has also had no episodes of decompensation.  *Id.* Accordingly, ALJ Thomas found Haman fails to meet this listing requirement as well.  *Id.*

the medical record.  *Id*. at 18.  For example, ALJ Thomas considered Dr. Gerratana's July 15, 2010 observation that Haman walked with a limp and had some weakness in her right ankle but had good sensation in her foot and good motion and stability in her right knee.  [*Id*. (discussing 11-8 at 308).]  He also considered Dr. Gerratana's August 19, 2010 analysis that physical therapy improved Haman's range of motion and ankle strength, which therapy – as noted above - Haman testified she continues to practice at home.  [*Id*. (discussing Dkt. No. 11-8 at 307); *Id*. at 39-40.]  ALJ Thomas noted that by October 1, 2010, Haman had only mildly restricted range of motion in her ankle with some weakness and tenderness.  [*Id*.; *see also* Dkt. No. 11-8 at 305 (December 2, 2010 treatment notes showing improved range of motion in ankle).]

ALJ Thomas also considered Haman's complaints of knee discomfort, but again found her complaints inconsistent with medical notes throughout the relevant time period indicating she could walk without a cane with either a slightly antalgic gait or a normal gait.  *Id*. at 18-20.  In particular, he considered a September 21, 2011 examination which revealed a normal range of motion in Haman's knees, and multiple examinations throughout the relevant period recording normal strength.  [*Id*. at 19 (discussing Dkt. No. 11-8 at 325).]  He also noted medical examinations revealed no significant boney abnormalities except some right knee diffuse osteoporosis.  [*Id*. at 18 (discussing Dkt. No. 11-8 at 304).]

ALJ Thomas also noted that Haman asserted her fingers swell and restrict her ability to pick up and hold objects, but that x-rays of Haman's hands showed

no significant arthritis or inflammatory conditions.  *Id.* at 19.  Similarly, he found no evidence of ongoing treatment for Haman's asserted headaches.  *Id.* at 21.

Regarding Haman's fibromyalgia, ALJ Thomas found Haman's testimony partially credible regarding the intensity, persistence, and limiting effects of her condition based on "the constellation of symptoms associated with a fibromyalgia diagnosis" and the medical record indicating her diagnosis and treatment are longstanding.  *Id.* at 21.  ALJ Thomas also considered Haman's full treatment history, including Dr. Formica's observation that she had 18 out of 18 tender points.  *Id.* at 19.  In addition, ALJ Thomas noted that while Haman experienced negative side effects with some medications, her condition improved with others.  *Id.* at 20.  For example, the ALJ cited May 31, 2012 treatment notes stating she appeared comfortable, had normal gait and strength, mild to moderate diffuse muscle tenderness in all extremities, and no joint warmth or synovitis. [*Id.* at 20 (discussing Dkt. No. 11-8 at 360).]  Based on Haman's testimony and the medical evidence, ALJ Thomas found her physically able to perform a light exertional level of work activity with no climbing of ropes, ladders, or scaffolds, no stooping, balancing, kneeling, crouching, or crawling, and only occasional climbing of ramps or stairs.  *Id.* at 21.

As to Haman's mental health, ALJ Thomas noted Haman received psychiatric treatment from March 18, 2010 through December 2, 2010.  *Id.* at 20.  Her Global Assessment Functioning ("GAF") score during that time ranged from 52 to 55, indicating "moderate symptoms/difficulties in functioning."  [*Id.* (citing *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition*).]  When she

was discharged from treatment, ALJ Thomas noted her treatment was rated as "successful or partially successful." *Id.* In addition, ALJ Thomas considered Dr. Badillo Martinez's evaluation which described Haman as polite, cooperative, easily engaged, with clear but slow speech and concrete but below average thought processes. *Id.* at 21. Although there are limited records regarding Haman's psychiatric condition because she ceased treatment in December 2010, ALJ Thomas "resolved the mental health impairment in the claimant's favor" and determined she has the "capacity for light work . . . further limited to unskilled jobs consisting of simple routine, repetitive tasks with short simple instructions and few workplace changes, requiring an attention span to perform simple work tasks for no longer than two-hour intervals throughout an eight-hour workday, with occasional superficial interaction with coworkers and no high-paced production demands. *Id.* at 21.

ALJ Thomas also weighed the medical opinions in the record, including Dr. Formica's October 12, 2012 letter opining that Haman is not a candidate for any employment. *Id.* at 21-22. ALJ Thomas found Dr. Formica's opinion was not supported by his own treatment notes which "consistently detail full strength [and] normal gait," with periodically slightly antalgic gait. *Id.* at 22. In addition, Dr. Formica's opinion conflicted with Dr. Badillo Martinez's consultative examination finding Haman had an average attention span. *Id.* Finally, ALJ Thomas noted Dr. Formica only had a seven-month treatment history with Haman, rendering his assessment less reliable. *Id.* Overall, he afforded Dr. Formica's opinion little weight. *Id.*

ALJ Thomas afforded great weight to the objective psychiatric records indicating Haman had a GAF score between 52 and 55, corresponding with moderate symptoms or impairments in functioning.  *Id.*  The ALJ found the scores gave "a general sense of the claimant's mental condition and as such are an accurate representation of the claimant's mental status when properly treated."  *Id.*

ALJ Thomas afforded Dr. Badillo Martinez's objective findings some weight, as they were consistent with Haman's GAF scores and the medical evidence.  *Id.*  However, he afforded little weight to her conclusion that Haman could perform only part-time sedentary work, as the opinion regarding Haman's physical limitations was outside her area of expertise as a consultative psychiatric physician.  *Id.*

ALJ Thomas also considered the State agency consultants' opinions of Haman's limitations upon review of the medical record.  *Id.* at 22.  He afforded great weight to their opinions as consistent with the medical record as a whole, and noted their expertise regarding the disability program.  *Id.*

Based on Haman's RFC, ALJ Thomas found her incapable of performing her past relevant work, which was light, semi-skilled work.  *Id.* at 22-23.  However, considering her age, education, work experience, and RFC, ALJ Thomas found Haman capable of working as a marker, routing clerk, or mail clerk.  *Id.* at 23-24.  ALJ Thomas considered Vocational Expert Jubrey's testimony that those jobs are all light exertional work within the parameters of Haman's additional limitations and exist in significant numbers in the national and local economy.  *Id.* at 24.

Because Haman could perform those jobs, ALJ Thomas concluded she was not disabled within the meaning of the Social Security Act. *Id.*

## II.    Standard of Law

The Social Security Act establishes that benefits are payable to individuals who have a disability.  42 U.S.C. § 423(a)(1).  "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ."  42 U.S.C. § 423(d)(1).  A person must be disabled within the meaning of the Social Security Act and not any other law or regulation.  A Social Security disability determination based on other laws or regulations is not dispositive of whether a person is disabled under the Social Security Act.  20 C.F.R. §§ 404.1504, 416.904.  That section provides that "[a] determination made by another agency that you are disabled. . . is not binding on [the] Social Security Administration."  See also, *Musgrave v. Sullivan*, 966 F.2d 1371, 1375, 37 Soc. Sec. Rep. Serv. 542, Unempl. Ins. Rep. (CCH) P 16760A (10th Cir. 1992) (ALJ did not err by not giving more weight to VA finding that claimant was 20% disabled). This position has been reinforced by the amendment to the regulation which now states that "on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits." 20 C.F.R. §§ 404.1504; 416.904.  Thus the weight given to the opinion of an expert who is familiar with the Social Security Act program is entitled to greater weight than the opinion of an expert who is unfamiliar with the program.

In order to determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[13]  A person is disabled under the Act when their impairment is "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*[14]

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function."  *Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any

---

oul[13]  The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4)(i)—(v).

[14]  The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." *Id.*

fact, if supported by substantial evidence, [are] conclusive . . . ."  42 U.S.C. § 405(g).  Accordingly, the Court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits.  *Id.*; *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and whether the decision is supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position.  *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence must be "more than a scintilla or touch of proof here and there in the record."  *Williams*, 859 F.2d at 258.

III.   Discussion

Haman asserts the ALJ's decision should be overturned for three reasons.  First, she asserts the ALJ erred in finding her combined fibromyalgia and left lower extremity impairment did not meet the requirements of social security

regulation listing 1.02, which covers major dysfunction of a joint.  [Dkt. No. 24 at 18.]  Second, Haman asserts the ALJ should have afforded her rheumatologist's opinion controlling weight.  *Id.* at 20.  Finally, Haman asserts ALJ Thomas erred in his assessment of Haman's credibility.  *Id.* at 20.  The Court discusses each argument in turn.

### a. The Listed Impairment Analysis

Haman asserts the evidence that she consistently experienced knee discomfort, ankle swelling, tenderness, limited range of motion, and a limp establish "impairment of major weight bearing joints" as required by Listing 1.02. *Id.* at 18-19 (citing Dkt. No. 11-8 at 303, 377).  Specifically, she cites Dr. Gerratana's June 2011 medical notes stating Haman "walked with a limp, had chronic swelling of her right ankle and tenderness," and providing her with heel lifts.  *Id.* (citing Dkt. No. 11-8 at 303).  She also cites medical notes by Dr. Formica two years after her April 2010 right ankle surgery noting continued muscle tenderness, right ankle swelling, and a limp.  *Id.* (citing Dkt. No. 11-8 at 353, 377). Haman concludes from these records that "appropriate imaging supports the existence of an anatomical defect following fracture" which meets the requirements of listing 1.02.  *Id.* at 19-20.  Haman also suggests the ALJ considered only her lower extremity impairment in the listing analysis, and that it was error not to consider the combination of that impairment and her fibromyalgia.  *Id.* at 18.

The Commissioner responds that ALJ Thomas did not consider Haman's lower extremity impairment in isolation, pointing out that the ALJ considered

Haman's fibromyalgia, right ankle fracture, and osteoarthritic knees and properly found the combined impairments did not meet or equal the requirements of Listing 1.02. [Dkt. No. 24 at 6.] The Commissioner reasons that physical examinations in the medical record show Haman was able to ambulate without an assistive device. *Id.* at 7. The Commissioner noted record evidence that Haman sometimes walked with an antalgic gait, but other times walked with a normal gait, and that she required crutches and a CAM boot only for the two months following her right ankle surgery. *Id.* at 7-8 (citing Dkt. No. 11-8 at 303-304, 309-11, 354, 360). In addition, the Commissioner asserts the only imaging in the record shows Haman's right ankle fracture "solidly united" after surgery, and Haman's knees have "some . . . diffuse osteoporosis/osteoarthritis, but otherwise showed no significant degenerative changes or other bony abnormalities." *Id.* (citing Dkt. No. 11-8 at 303, 304, 308, 327).

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The plaintiff bears the burden of establishing she meets the requirements of a listed impairment. *Id.*

Listing 1.02 requires:

gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,[15] instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable

---

[15] Ankylosis is "stiffness or fixation of a joint by disease or surgery." *Ankylosis Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/ankylosis (last visited February 10, 2017).

> imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> OR
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. 404, Subpart P, App. 1, 1.02.  The "inability to ambulate

effectively" is defined as:

> An extreme limitation of the ability to walk' i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. 404, Subpart P, App. 1, 1.00(B)(b)(1).  By contrast, to ambulate

effectively, an individual:

> Must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. 404, Subpart P, App. 1, 1.00(B)(b)(2).

> In addition to assessing her lower extremity impairment, ALJ Thomas

explicitly considered whether the combination of Haman's fibromyalgia and the

residual effects of her right ankle fracture met the criteria of Listing 1.02.  [Dkt. No. 11-3 at 15.]  Because the medical record established Haman could "ambulate without an assistive device and does not show any significant limitations in her left lower extremity," he found listing 1.02's requirements were not met.  *Id.*  In addition, ALJ Thomas noted that, while Haman complained of difficulty using her hands, there was "no evidence of arthritic changes in her upper extremities and she has full upper extremity strength."  *Id.*

ALJ Thomas' conclusion that Haman is able to ambulate effectively and retains use of her upper extremities is supported by substantial record evidence. Although Haman correctly notes that she has used assistive devices, including crutches and a stabilizing boot immediately after her ankle surgery and orthotic inserts later, there is no record evidence establishing that she must use a hand-held assistive device that limits the function of both of her upper extremities, beyond her use of crutches immediately after her surgery.  *See* 20 C.F.R. 404, Subpart P, App. 1, 1.00(B)(b)(1); *see also, e.g.,* Dkt. No. 11-8 at 349 (stating as of March 22, 2012 Haman walked without the use of a cane).  In addition, State agency consultant Dr. Khan concluded from the medical record that Haman could sit, stand, or walk for six hours out of an eight-hour workday.  [Dkt. No. 11-4 at 77.]  Further, Haman testified at her hearing that she only walks with a cane outside her home, when her legs are swollen or the weather is inclement; regardless, the use of one cane would not limit the functioning of both upper extremities as required by the social security regulations.  [20 C.F.R. 404, Subpart P, App. 1, 1.00(B)(b)(1); Dkt. No. 11-3 at 40-41.]  Haman also estimated she could

walk "maybe a quarter mile" at a time and testified she regularly completes daily living activities including doctor's visits and grocery shopping, further meeting the requirements of the regulations.  [20 C.F.R. 404, Subpart P, App. 1, 1.00(B)(b)(2); Dkt. No. 11-3 at 51-52.]

Further, although Haman did not raise it in her objection, ALJ Thomas's conclusion that Haman retained the ability to perform fine and gross motor functions in her upper extremities is also supported by substantial record evidence.  As ALJ Thomas noted, x-rays indicated "no significant arthritis" in Haman's hands, as well as "preservation of the joint spaces with no bony, or soft tissue abnormalities."  [Dkt. No. 11-8 at 328.]  The record indicates she retained use of her upper extremities.  For example, Haman testified she can use a computer up to half an hour at a time even when her hands are swollen.  [Dkt. No. 11-3 at 57.]  She also indicated she can fold laundry, cook light meals, and wash dishes.  *Id.* at 59.

Substantial record evidence supports ALJ Thomas's conclusion that Haman met neither subpart A nor subpart B to the requirements of Listing 1.02. Haman's Motion to Reverse the Decision of the Commissioner on this ground is DENIED; the Commissioner's Motion to Affirm is GRANTED.

####   b.  The Treating Physician Rule

Haman asserts the ALJ should have deferred to Dr. Formica's assessment of her limitations based on her "detailed examination" and qualification as a physician.  [Dkt. No. 17 at 20.]  Specifically, Haman asserts Dr. Formica's assessment that she had 18 out of 18 tender points should have led ALJ Thomas

to accept Dr. Formica's assessment that Haman was not a candidate for employment of any kind.  *Id.*

The Commissioner responds that ALJ Thomas appropriately weighed Dr. Formica's opinion with the other record evidence for three reasons.  [Dkt. No. 24 at 10.]  First, the Commissioner noted Dr. Formica's conclusion that Haman could not work is an opinion reserved to the Commissioner and is not entitled to deference because it came from a treating physician.  *Id.* (citing 20 C.F.R. 404.1527(d)(1) ("A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.")).  Second, the Commissioner argues Dr. Formica's opinion is less persuasive because he had only treated Haman for seven months when he gave his opinion as to her limitations.  *Id.*  Third, the Commissioner asserts Dr. Formica's opinion warrants less weight because it is inconsistent with his own treatment notes stating Haman sometimes had a slight antalgic gait and sometimes had a normal gait and finding Haman alert and fully oriented.  *Id.* at 11 (citing Dkt. No. 11-8 at 349, 353-54, 359-60).  Fourth, the Commissioner notes Dr. Formica's opinion is inconsistent with State agency medical consultants Drs. Khan, Honeychurch, Fadakar and Leib, which conclude Haman can perform a range of unskilled light work and has the mental capacity to complete simple, routine tasks for two-hour periods throughout a workday.  *Id.* at 13 (citing Dkt. Bo. 11-4 at 76-77, 93-95).  The Commissioner asserts the State medical consultants' opinions are supported by substantial record evidence, while Dr. Formica's opinion is not.  *Id.* at 14.

A treating physician generally garners greater weight under the social security regulations because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."   20 C.F.R. 404-1527(c)(2).

Given the unique nature of a treating physician's opinion, such an opinion is generally "given 'controlling weight' as long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (holding that "[a] treating physician's opinion need not be given controlling weight where it is not well-supported or is not consistent with the opinions of other medical experts" where those other opinions amount to "substantial evidence to undermine the opinion of the treating physician").  Where a treating physician's opinion conflicts with other record evidence, it is "within the province of the ALJ" to determine which portions of the report to credit, and to what extent.  *Pavia v. Colvin*, No. 6:14-cv-06379 (MAT), 2015 WL 4644537, at 4 (W.D.N.Y. Aug. 4, 2015) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

In determining the amount of weight to give a treating physician's opinion, the social security regulations provide certain considerations:  "Generally, the

longer a treating source had treated [a claimant] and the more times [the claimant] has been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion."  20 C.F.R. 404-1527(c)(2)(i).  In addition, "the more knowledge a treating source has about [the claimant's] impairment(s), the more weight [the ALJ] will give the source's medical opinion."  20 C.F.R. 404-1527(c)(2)(ii).  In determining a treating physician's level of knowledge, the ALJ looks at "the treatment the source has provided and . . . the kinds and extent of examinations and testing the source has performed."  *Id.*  Further, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion."  20 C.F.R. 404-1527(c)(3).

The ALJ found Dr. Formica's limitation determination inconsistent with his own treatment notes, which "consistently detail[ed] full strength [and] normal gait."  [Dkt. No. 11-3 at 22.]  In addition, he noted Dr. Formica only treated Haman for seven months "and is unable to adequately render an opinion on the claimant's condition since her 2010 onset date, which makes his opinion even less persuasive."  *Id.*  Finally, ALJ Thomas found Dr. Formica's determination that Haman was unable to work partly due to poor concentration conflicted with the State agency psychiatric examinations, which indicated Haman retains an "average attention span."  *Id.*  ALJ Thomas gave the State agency medical and psychiatric opinions "great weight" because they were "consistent with the medical evidence as a whole," and because as consultants, they reviewed the

34

entire record and had the requisite knowledge to form an opinion on the claimant's disability.  *Id*.

ALJ Thomas appropriately afforded little weight to Dr. Formica's opinion. As a treating physician for only seven months leading up to his opinion of Haman's limitations, Dr. Formica lacked the "longitudinal picture" and "unique perspective to the medical evidence" that generally warrants deference.  20 C.F.R. 404-1527(c)(2).  In addition, Dr. Formica's opinion as to Haman's psychiatric limitations falls outside his expertise and as such is less reliable.  20 C.F.R. 404-1527(c)(2)(ii).  Finally, ALJ Thomas's determination that Dr. Formica's opinion was not supported by his own treatment notes or the record as a whole is supported by substantial evidence.  Dr. Formica noted throughout the time he treated Haman that she "walked without the use of a cane" (Dkt. No. 11-8 at 349 (March 22, 2012 treatment notes)), had a "slight antalgic gait" (*Id*.) or "normal strength [and] normal gait" (*Id*. at 375 (September 6, 2012 treatment notes)). These observations conflict with Dr. Formica's conclusion that Haman is not a candidate for employment of any kind.  *Id*. at 365.

Further, Haman's own testimony indicates she only uses a cane when leaving the house on days when her legs are swollen or the weather is inclement. [Dkt. No. 11-3 at 40-41.]  In addition, she testified she can use a computer, go to the grocery store, and complete housework including folding laundry and doing dishes.  *Id*. at 59-60.  The record as a whole does not support Dr. Formica's opinion prohibiting all work; ALJ Thomas' decision to afford it little weight was

appropriate.[16]  [Dkt. No. 11-4 at 78-80.]  Haman's Motion to Reverse the Decision

of the Commissioner on this point is DENIED; the Motion to Affirm is GRANTED.

### c.  The Credibility Analysis

Lastly, Haman asserts that because "objective tests are of little help in

determining [fibromyalgia's] existence or its severity," the ALJ should not have

discounted her testimony regarding her symptoms as unsupported by record

evidence.  [Dkt. No. 24 at 21 (citing *Preston v. Sec'y of Health & Human Servs.*,

854 F.2d 815, 820 (6th Cir. 1988)).

The Commissioner responds that ALJ Thomas appropriately found

Haman's statements "not entirely credible."  [Dkt. No. 24 at 14 (discussing Dkt.

---

[16] By contrast, ALJ Thomas afforded "great weight" to the State agency medical
opinions, which limited Haman to light work with some non-exertional limitations.
[Dkt. No. 11-3 at 22; 11-4 at 78-80.]  Those milder limitations better coincided with
the medical record, namely the same treatment notes and testimony which
undermined Dr. Formica's opinion.  In addition, the Court notes that elsewhere in
his decision, ALJ Thomas demonstrated awareness of the deference owed to
treating physicians whose opinions are supported by the medical record.  When
assessing Haman's psychiatric limitations, ALJ Thomas afforded "great weight"
to the GAF scores of 52 and 55 assigned by treating psychiatrists, which indicate
she has "moderate symptoms/impairments in functioning."  [Dkt. No. 11-3 at 22.]
ALJ Thomas noted the GAF scores, among the few records from Haman's brief
period of psychiatric treatment, "are an accurate representation of the claimant's
mental status when properly treated."  *Id.*  ALJ Thomas also afforded "some
weight" to non-treating psychiatrist Dr. Badillo Martinez's objective findings from
her examination of Haman, including that Haman had clear but slow speech and
concrete but below average thought processes.  *Id.* at 21-22.  Such findings were
consistent with Haman's treating physicians' GAF scores and evidence of
Haman's daily activities.  *Id.* at 22.  However, Dr. Badillo Martinez's conclusion
that Haman could do only part-time sedentary work conflicted with the GAF
scores and the record as a whole.  *Id.*  In addition, ALJ Thomas noted that Dr.
Badillo Martinez's conclusion was largely based on perceived physical limitations
which were outside the scope of her expertise as a psychiatrist, and accordingly
was due limited weight.  *Id.*  ALJ Thomas' analysis of the treating and non-
treating psychiatrists' opinions appropriately considers the factors set forth in 20
C.F.R. 404-1527(c) and is supported by substantial record evidence.

No. 11-3 at 21).]  The Commissioner asserts ALJ Thomas rightfully considered Haman's treatment history when assessing her credibility.  *Id*. at 15.  In particular, the Commissioner noted Haman's surgery which successfully reunited Haman's fractured ankle, instruction to use heel lifts to address her gait, and slight improvement of her fibromyalgia symptoms with certain medications.  *Id*.  The Commissioner also emphasized that Haman's testimony regarding severe headaches conflicted with treatment notes in which she only complained of headaches once.  *Id*.  Similarly, the Commissioner argues Haman's testimony regarding daily anxiety attacks since she was fifteen years old is contradicted by her past successful employment and self-report that Klonopin effectively managed her anxiety.  [*Id*. (citing Dkt. No. 11-7 at 222 (Activities of Daily Living Questionnaire dated August 16, 2011)).]  In addition, the Commissioner asserts Haman's testimony regarding her daily activities, including cooking, brushing her teeth and hair, stretching, and using the computer, discredits her assertions regarding the intensity of her pain.  *Id*. at 16.  Accordingly, the Commissioner argues ALJ Thomas rightfully assessed that Haman was "not entirely credible."

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." <u>Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir.1988).  The commissioner's determination must be afforded considerable deference. The district Court may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have

reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

In determining credibility, the ALJ must first determine if the claimant's asserted symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §§ 404.1529(a), 416.929(a).  If so, the ALJ assesses the claimant's credibility with respect to the alleged pain symptoms. "[A] claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence." *Skillman v. Astrue,* No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010) (citing *Simmons v. U.S.R.R. Retirement Bd.,* 982 F.2d 49, 56 (2d Cir. 1992)); *8barringer v. Commissioner of Social Security,* 358 F. Supp. 2d 67 (Applying Two Step analysis described in 20 C.F.R. §§ 4:04.1529 (symptoms including pain)) **Two step credibility process applies whether the impairment is physical or mental. *Sweet v Astrue,* 32 F. Supp. 3d. 303, 317-318 (N.D.N.Y 2012)

If the objective evidence does not support the plaintiff's testimony with respect to functional limitations and pain, the ALJ considers the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).[17] *Skillman,* 2010 WL 2541279, at *6. The factors to be considered are i)  the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage,  effectiveness, and side effects of any medication the claimant takes or has taken to alleviate their

---

[17]  These factors include daily living activities, any medications and treatments and their efficacy, and any other relevant factors. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

pain or other symptoms; (v) treatment, other than medication, the claimant receives or has received for relief of their pain or other symptoms; (vi) any measures the claimant used or has used to relieve their pain or other symptoms (e.g., lying flat on their back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and  (vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  "To be disabling, pain must be so severe, by itself or in combination with other impairments, to preclude any substantial gainful activity." *See Manzo v. Sullivan*, 784 F. Supp. 1152, 1157 (D.N.J. 1991) (citing *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir. 1983)). The ALJ should consider medical findings, other objective evidence, and subjective evidence of pain in assessing the claimant's credibility. *Id.*  A plaintiff's good work record is one of many factors the ALJ considers in determining a claimant's credibility.  *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998).

The ALJ's "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen, 859 F.2d 255,* 260-61 (2d Cir. 1988).  The "ALJ's credibility determination is generally entitled to deference on appeal." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

ALJ Thomas determined Haman's reports of "the intensity, persistence and limiting effects of [her] symptoms are not entirely credible" because of Haman's ability to function with her condition.  [Dkt. No. 11-3 at 21-22.]  The ALJ noted the "constellation of symptoms associated with a fibromyalgia diagnoses," but found Haman's hearing testimony "greatly overstated" her limitations in light of the medical evidence.  *Id.*  For example, ALJ Thomas cited musculoskeletal examinations revealing normal range of motion of the affected joints with the exception of restricted movement of the right ankle, and five out of five upper and lower extremity strength with the exception of the right quadriceps.  *Id.* at 19.  He also emphasized that Dr. Formica's treatment notes "consistently detail full strength [and] normal gait."  *Id.* at 22.

Further undermining Haman's credibility in the eyes of ALJ Thomas was her testimony regarding severe headaches, which was uncorroborated by medical evidence of complaints, head examinations or treatment, as well as Haman's assertion that she has arthritis in her hands when Dr. Formica's x-ray's indicated no significant arthritis.  *Id.* at 21.

Where the record was unclear, ALJ Thomas resolved any question regarding Haman's credibility in her favor.  Regarding her mental health complaints, given that there was limited medical evidence of her condition since she stopped treatment in 2010, ALJ Thomas assumed Haman's testimony of her limitations was credible.  *Id.* at 21.  He accordingly limited her capacity for light work to "unskilled jobs consisting of simple routine, repetitive tasks with short simple instructions and few workplace changes, requiring an attention span to

perform simple work tasks for no longer than two-hour intervals throughout an eight-hour workday, with occasional superficial interaction with coworkers and no high-paced production demands." *Id.* at 21.

The Court does not dispute that there are "unique difficulties associated with the diagnosis and treatment of fibromyalgia." [Dkt. No. 24 at 20 (citing *Rogers v. Comm'r*, 486 F.3d 234, 243-44 (6th Cir. 2007).] The Court recognizes that fibromyalgia is "characterized by generalized aching (sometimes severe), widespread tenderness of muscles, areas around tendon insertions, and adjacent soft tissues, as well as muscle stiffness, fatigue, and poor sleep." *Fibromyalgia Definition*, MERCK MANUAL ONLINE MEDICAL LIBRARY, http://www.merckmanuals.com/professional/musculoskeletal-and-connective-tissue-disorders/bursa,-muscle,-and-tendon-disorders/fibromyalgia (last visited February 7, 2017). The Court also recognizes that while there is no conclusive test to diagnose the condition, Fibromyalgia is diagnosed through identification of symptoms and in addition "usual testing to exclude other disorders." Id.; http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/tests-diagnosis/CON-20019243,last visited March 2, 2017.

Critically, the ALJ did not find Haman's reports of fibromyalgia symptoms not credible based on the lack of medical evidence supporting her diagnosis, but rather based on her compromised credibility which undermined her claim of the severity of her symptoms. ALJ Thomas accepted her diagnosis as clearly supported by the medical evidence. *Id.* at 21. The ALJ's credibility analysis rested on a determination that Haman's testimony regarding the "intensity,

persistence and limiting effects of [her] symptoms" was "greatly overstated" compared to record evidence of her strength, range of motion, and daily activities.  *Id*.  The ALJ's determination is supported by substantial record evidence.  Accordingly, Haman's Motion to Reverse the Decision of the Commissioner on this ground is DENIED; the Motion to Affirm is GRANTED.

IV.   Conclusion

For the reasons set forth above, Haman's Motion for an Order Reversing or Remanding the Commissioner's Decision [Dkt. No. 17] is DENIED and the Commissioner's Motion to Affirm that Decision [Dkt. No. 24] is GRANTED.

It is so ordered this 2nd day of March 2017, at Hartford, Connecticut.

_____/s/_____

Vanessa L. Bryant, U.S.D.J.

42